IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JENNIFER J. ANDERSON,
       Plaintiff,

vs.                          No. 19-2774-JTM

LEAVENWORTH COUNTY
BOARD OF COUNTY COMMISSIONERS,
       Defendant.

MEMORANDUM AND ORDER

Plaintiff Jennifer Anderson was terminated from her Leavenworth County, Kansas employment in 2019. She alleges that she was terminated in retaliation for filing an earlier EEOC charge against County personnel, and brings claims for retaliation in violation of Title VII, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623; and the the Kansas Act Against Discrimination (KAAD), K.S.A. 44-1009.[1] The matter is before the court on the County's Motion for Summary Judgment. For the reasons provided herein, the court finds that the motion should be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment

---

[1] The plaintiff also advances a common law whistleblower claim, which she agrees in her Response to the County's motion should be dimissed.

as a matter of law.  Fed.R.Civ.P.  56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule

should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

Anderson worked in the County's Human Resources department as payroll manager from 2002 until February 13, 2019. In 2017, in addition to Anderson, the HR department employed Director Tamara Copeland, benefits manager Hallie Hughes, and HR generalist Jenna Gillaspie. Copeland, the HR Director from May 2015 to October 30, 2017, was Anderson's supervisor. Copeland reported to the Board of County Commissioners.

The cover of the County's Policies and Procedures handbook (the "Handbook") states: "State statutes grant certain rights to elected department Directors. This manual is not intended to supersede any statutorily granted rights to those positions."

The "Disciplinary Acts" section of the handbook includes a policy titled "Conduct Subject to Disciplinary Action" which includes a non-exhaustive list of conduct that may subject an employee to discipline, including, "21. Displays of insubordination, to include, refusal to abide by any lawful regulation or order or failure to obey any proper direction made by a supervisor or manager," and "23. Displays discourteous or disruptive conduct or other offensive behavior . . . to employees and officers of the County." The same section includes a policy titled "Disciplinary Protocol" that recognizes seven types of discipline ranging from verbal warning to termination. The types of discipline listed "are not necessarily required to be

administered in a sequential fashion," and "[d]isciplinary actions are not taken in a prescribed sequential order, but are chosen as the circumstance may dictate and one or more types of disciplinary action may be taken in any particular instance or instances at the sole discretion of Leavenworth County."

On January 5, 2017, Anderson submitted a complaint to Copeland raising concerns about policy violations by, among others, commissioner-elect Doug Smith and County Clerk Janet Klasinski, along with harassment and other whistleblowing. Anderson alleged that Klasinski had violated County policy by driving four employees to a funeral in a County vehicle, and that three of the employees inaccurately reported a full day worked on their timesheets.

In January 2017, Hallie Hughes also submitted an internal complaint to Copeland, and Copeland prepared an internal complaint herself. Copeland has testified that after she received the complaints, she submitted a summary of them to the KBI and possibly the FBI. She never provided a copy of Anderson's complaint to anyone inside the County, including County Administrator Mark Loughry or the Board of Commissioners.

It is uncontroverted that Klasinski was never told Anderson had filed a complaint about her, was never questioned about the underlying allegations, and first learned about the complaint after Anderson filed this suit.

Beginning January 9, 2017, Doug Smith replaced Dennis Bixby on the Board of Commissioners, resulting in a Board consisting of Smith, Clyde Graeber, and Bob

Holland. Just before Smith was sworn in, Copeland went into executive session with the Board, Loughry, and the County Counselor, and presented them with a document indicating that HR staff and others had reported illegal activity and were protected as whistleblowers.

Copeland asked for a second executive session after Commissioner Smith was sworn in, but the request was denied, so after the meeting she handed Smith and Graeber copies of the document and told them they could have an executive session and she would explain the issue in more depth. According to Copeland, the document she presented did not identify the specific complaints reported to her, and Copeland could not recall whether the document identified Anderson as a whistleblower or if it referred to the entire HR department, collectively, as whistleblowers.

Anderson was interviewed by the KBI and FBI about her complaints, but to her knowledge the County conducted no internal investigation.

In the winter of 2016, the Board terminated county counselor David Van Parys, before rehiring him in January 2017. In September 2017, Channel 41 published a story about Van Parys's termination, in which it referenced having obtained a copy of Van Parys's termination letter.

On October 8, 2017, Copeland filed an EEOC charge of discrimination, asserting complaints of sex discrimination and retaliation.

On October 12, 2017, Louis Klemp replaced Clyde Graeber on the Board of Commissioners. At the October 12 meeting in which Klemp took office, the Board sent

5

the HR Department home for the day, changed the locks on the HR office, locked the door, and moved the HR Department under Klasinski's supervision.

Anderson believed the Board was upset that Channel 41 had obtained Van Parys's termination letter, and blamed the HR Department and former Commissioner Dennis Bixby for the leak, although none of the Commissioners blamed Anderson, specifically.

On October 15, 2017, Copeland sent County Administrator Loughry an e-mail about the Board's actions. In an attached document, Copeland asserted that "[t]he motion taken on 10/12/17 has created an unbearable hostile work environment for employees who have all reported serious county, state, and federal violations and have a protected status per our county policy and in the eyes of law enforcement."

She also alleged "[t]he Board action creates a HOSTILE and retaliatory work environment as several HR Department staff members have filed valid complaints against multiple employees including Janet Klasinski." Copeland wrote that "we have reported to the County Administrator and the County Commissioners on multiple occasions of our status so the Commission cannot say they did not know."

Loughry received Anderson's Leavenworth County whistleblowing complaint form on October 27, 2017. He also received the whistleblowing complaint forms from Hughes and Copeland about that same time. He took the whistleblowing complaints, from three out of the four HR employees, seriously.

The following day, Loughry told Copeland she was being put on administrative leave and as a result, Copeland asked the plaintiff Anderson to attend the October 16 Board meeting on her behalf.

At the October 16 meeting, the Board re-assigned the HR Department from Klasinski to Loughry because Klasinski did not want to undertake responsibility for the department. Loughry supervised the HR Department from October 16 to November 9, 2017.

After the meeting, Klasinski met with Anderson and told her she should have asked for permission from her beforehand to attend the meeting.

During their meeting, Anderson and Klasinski were both upset about the recent turmoil, but Anderson did not believe she was disrespectful to Klasinski. According to Anderson,

> apparently a couple of [Klasinski's] staff overheard . . . were right outside her office and her door w[as] shut, and they had informed commissioners that I was loud and disruptive and -- and I talk loud, I do. I talk loud anyway, so I'm sure that they could hear our conversation. You know, I wasn't yelling at her or being disrespectful, we were just discussing the things that were going on.

On October 25, 2017, Loughry and Klasinski met with Anderson, and Loughry verbally counseled her that raising her voice when talking to a supervisor or department head is not appropriate, and regardless of differences of opinions or emotions, she must show respect in the workplace.

Loughry did not witness the incident between Anderson and Klasinski and he did not personally investigate it. He had been told by Commissioner Klemp that he needed to address the incident. He verbally counselled Anderson because he feared if he did not handle it, Commissioner Klemp would act against her publicly.[2]

Klasinski did not ask Loughry to verbally counsel Anderson, and believed the issue was already resolved. Although she was willing to disregard the incident, she agreed to a verbal warning of Anderson to avoid any more public discussion of the issue.

According to Anderson, as she left with Klasinski, the County Clerk told her that she had not thought their prior meeting was a big deal, but her employees had apparently reported to the Board that Anderson had been talking loudly, and the Commissioners had wanted it addressed.

Anderson was not suspended, demoted, or docked pay because of the verbal counseling, which is the only formal discipline in her personnel file.

On October 26, 2017, HR benefits manager Hughes submitted a complaint to Loughry about Commissioners Klemp and Smith. The next day, Anderson submitted

---

[2] Plaintiff claims (Resp. ¶ 138) that, when Loughry counseled Anderson, he was inappropriately inserting himself into the situation, because it was "[i]t was Klasinski, not Loughry, who was in charge of the employment supervision of Anderson." This is not correct. The parties stipulated in the Pretrial Order that Loughry supervised the HR Department from October 16 to November 9, 2017.

an EEOC questionnaire, although the document is not part of the record and Anderson does not recall its allegations. On the same day, Anderson submitted a complaint to Loughry via email on the County's "Whistleblowing or Harassment Report and Complaint Form" about Klemp and Smith, stating that "HR department staff members have filed prior valid complaints that are being addressed by external law enforcement," and expressed concern about statements by Klemp and Smith in Board meetings suggesting the HR department could not be trusted. Anderson stated also that "I have also filed a simultaneous EEOC complaint."

Loughry hired an entity called Human Resource Solutions (HRS) to investigate Anderson and Hughes's internal complaints.

Before her deposition, Klasinski was unaware Anderson had filed an internal complaint with Loughry and had never seen the complaint.

On October 30, 2017, the Board fired Copeland, and eliminated the HR director position.  On November 9, 2017, the Board reassigned HR from Loughry back to Klasinski, who supervised the department from then on.

Klasinski did not want to have the HR department placed under her control, but she agreed to take control after Loughry asked her. She does not know why Loughry did not want control of the HR department himself.[3]

---

[3] The plaintiff argues (Resp. ¶ 133) that Loughry or the Board placed HR under the County Clerk's control because she was an elected official. However, the cited testimony of Klasinski is clearly her speculation about what might have been the motive for the move. Klasinski states she had no personal knowledge of why the move was made.

As County Clerk, an elected position, only Klasinski had the authority to terminate HR department employees. Klasinski has testified that she tries to follow the County's policy and procedure handbook, but believes that, as an elected official, she is not required to do so.

On December 5, 2017, HRS submitted a memorandum of its findings to Loughry, in which HRS indicated, in part:

> Of all the other events described, while there was behavior that could be viewed as rude, inappropriate, or petty, none could qualify as prohibited harassment under the County's Employee Handbook. For example, both complaints mention that the County Commissioners had the HR office locks changed. That decision, to change locks, did not materially affect anyone in the HR office or any individual's ability to perform their work – and certainly would not violate the harassment policy listed above.

HRS also noted that because Anderson alleged she had filed a complaint with outside law enforcement, she was a "whistleblower" under County policy. HRS concluded it was "unable to find any tangible employment actions that constitute prohibited or unlawful actions against the two Complainants."

Loughry personally met with Brian Huston of HRS to discuss the memorandum. Loughry understood that HRS believed that Anderson was protected under her whistleblower status from any form of retaliation. He also understood that he could not retaliate against Anderson for filing an EEOC complaint.

No one told Klasinski what the allegations in Anderson's EEOC charge were, and she first learned Anderson had filed an EEOC charge when she was told HRS had conducted an investigation and made no findings.

Klasinski was not interviewed by HRS and first saw HRS's memo after this lawsuit began. She was not informed HRS had labeled Anderson a "whistleblower."

On December 5, 2017, Anderson filed a charge of discrimination with the EEOC against the County on the basis of sex, age, and retaliation. Anderson's charge did not allege discrimination by Klasinski, and she has no recollection of discussing her EEOC charge with Loughry or Klasinski.

No one inside the County, including Loughry or Klasinski, made any comment to Anderson that suggested to her they were upset or frustrated she had filed an EEOC charge.

On December 5, 2017, Hughes also filed an EEOC charge on the basis of sex and retaliation. Loughry sent an e-mail to Hughes three days later, indicating he was upset by the tone of an e-mail Hughes sent the day before. The e-mail stated, in part:

> Over the past 11 months on several occasions when I have brought something to HR it has been challenged and often times in a manner I consider disrespectful to my position. While it hasn't been you specifically each time, the email I received yesterday leads me to believe that the attitude is pervasive within the HR Department now Division. I have been fairly lenient with the HR Division given all of the change and turmoil of late and have let a few recent incidents slide, however I will not let it slide again.

Between the time she filed her Charge and her termination in February 2019, Anderson received no write-ups or discipline. Anderson has testified that prior to her termination, Klasinski never did anything that she felt was retaliation for the complaints she had made in 2017.

11

On February 6, 2018, Loughry sent Klasinski an e-mail in which he "respectfully request[ed]" she give the HR Department a "final warning" that the HR office was not a public access area, after he received a report that Copeland and former Commissioner Bixby had been seen inside the HR office visiting.

Klasinski brought Loughry's e-mail to the HR Department, but, according to Anderson, he "pretty much blew it off and said don't worry about it, you guys don't have to put this in your file, but just know that in the future if you let Tamara or Mr. Bixby in the office, there will be terminations." Klasinski commented to Anderson at some point that she did not want to oversee HR, and implied she only continued to do so to protect them from Loughry, who could not fire Clerk's Office employees. Anderson's perception was that HR Department upset Loughry by frequently challenging or questioning him.

Although Anderson did not identify Loughry as having discriminated against her in her EEOC charge, she testified in her deposition that she believed Loughry saw the EEOC charge as "challenging authority" and as a result "he had it out for us." Anderson could not identify any specific instance where Loughry was upset with her, directly, for questioning him. Aside from the December 2017 e-mail to Hughes and the February 2018 statement to Klasinski, Anderson could not recall any instance of Loughry expressing frustration with the HR Department.

On March 8, 2018, Klasinski terminated Hughes, telling her it was "in the best interest of the County." It is uncontroverted that before Hughes's termination, Klasinski

and Anderson spoke several times about Hughes struggling to get work done correctly and accurately, reassigning job duties elsewhere, and the possibility Hughes may be fired. Although Klasinski decided to fire Hughes, she asked Loughry to deliver the news because she had never fired anyone before. Hughes was not issued verbal reprimands, written reprimands, probation, or demotion before she was terminated.

On December 11, 2017, Loughry and the County had executed a fourteen-month employment contract. Anderson played no role in negotiating the contract, does not know who drafted it, and has never had any discussion with Loughry about its substantive provisions. Clause VII.B.2 of the contract states: "The County Administrator shall receive twenty two (22) days of annual vacation under this Agreement."

In 2018, the County adopted a policy establishing the maximum vacation leave hours employees could accumulate, and that allowed employees to "sell" back accrued leave over the maximum.

On December 31, 2018, Loughry sent Anderson an e-mail that read: "Jennifer, I know once I get my new accruals I will have vacation time in excess of the limit. When processed I would like to have that paid on a separate check, not direct deposited."

Anderson interpreted the contract to entitle Loughry to 22 total days of vacation for the entire fourteen-month term. Loughry interpreted the Contract to entitle him to twenty-two vacation days each year. Loughry never said anything to Anderson about her interpretation of his contract.

13

On December 31, 2018, Anderson called Klasinski, told her about Loughry's request, and indicated she did not think Loughry was entitled to additional vacation days and did not know how to respond. Klasinski told Anderson she would talk to Loughry.

On January 2, 2019, Klasinski told Anderson she had talked to Loughry and Anderson should "pay it." Anderson told Klasinski the contract did not entitle Loughry to additional vacation, and Klasinski responded that there was nothing they could do because Loughry was the County Administrator. Anderson told Klasinski the Board was the ultimate authority, but Klasinski told her she was not going to go to the Board. Finally, Klasinski reminded Anderson that Loughry was due for a new contract in February and would not be getting additional vacation, so paying him now would just be giving him the vacation days early.

Anderson did not speak to any current Commissioner about Loughry's contract, but did speak to Holland, who had been a Commissioner when the Contract was executed, along with the terminated HR director Copeland, who had participated in drafting one of Loughry's prior contracts, both of whom agreed with her interpretation.

On January 17, Anderson spoke to Klasinski, telling her the Board had approved a new contract for Loughry that gave him additional vacation. Klasinski told Anderson she would talk to Loughry again.

Anderson next spoke to Klasinski on January 28, 2019. Anderson told Klasinski she thought Klasinski could "get in trouble" if there was an audit and it was discovered

the County paid this money out, but never described the requested payment as "fraudulent." The conversation ended with Klasinski telling Anderson she would talk to Loughry.

Two days later, Klasinski and Anderson discussed Loughry's request for a final time, during a brief conversation in which Klasinski directed Anderson to pay the money.

On February 4, 2019, Klasinski asked Anderson to cross-train Lynda Abbott, the County's fiscal services grant manager, on payroll.

Anderson was the only employee with the knowledge to complete the payroll duties from 2017 through the end of her employment. After Klasinski had taken over the HR Department in 2017, Anderson suggested to her, on multiple occasions, the need to cross-train someone on payroll, and suggested HR generalist Gillaspie as a candidate. However, because of how busy the HR department was during the time, Anderson never had time to train Gillaspie.

Between 2017 and 2018, Loughry had multiple conversations with Klasinski about the need to cross-train Anderson's payroll duties, but Klasinski relayed that the HR staff was overworked and did not have time to cross-train. On the need to cross-train, Loughry testified:

> I believe there was an urgency from the get-go in 2017 or I wouldn't have brought it up. We run a multi-million dollar payroll. And to have one common point of failure is a concern of mine and would be regardless of who that person was. If it was me doing the payroll, I would still have a problem if I was the only one that could do the payroll. So other than

there was just an overall urgency that I believe we needed to have somebody cross-trained, no, there was no magic date that February had anything to do with it.

In late 2018, Loughry suggested to Klasinski that Abbott who had been recently hired and had an accounting degree and available time, might be a good candidate to cross-train on payroll.

Anderson asked what prompted the sudden urgency for cross-training and asked in a joking tone if she was being fired, but Klasinski told her she was not. Nonetheless, because Abbott was not part of the HR Department and had nothing to do with payroll, Anderson assumed the request had something to do with her raising issues about Loughry's requested payout.

Later that day, Abbott met with Anderson to schedule training and Abbott mentioned that Loughry first mentioned cross-training to her on January 28, one of the dates Anderson met with Klasinski to express concerns about Loughry's request.

Anderson does not know whether Loughry mentioned cross-training to Abbott before or after she met with Klasinski, and but assumed the events were related.

After rescheduling several times, Anderson and Abbott scheduled their training to begin at 10:00 a.m. on February 13.

On the morning of February 13, Klasinski saw Abbott in the hallway and told her to head to the HR Department to start training early because training had already been rescheduled several times and Klasinski felt it was important.

Not long after running into Abbott, Klasinski visited the HR department to check in. The HR office is an open workspace, with one enclosed office, where Anderson worked.

When Klasinski arrived, she stood in the main area, while Anderson remained in her office. Anderson was frustrated and, from her office, addressed Klasinski in a "loud" or "raised" voice, asking if they could start training at 10:00 because she was really busy and had things to catch up on. Klasinski told Anderson she had been asking her to cross-train for over a year. Anderson asked Klasinski what the urgency was and told Klasinski she did not understand why cross-training was so urgent.

Anderson testified:

I was not yelling at [Klasinski]. I was not disrespectful. I was upset because I wanted to know what was going on but I wasn't -- I just wanted to know what was going on, and I talked to her in this tone before because there has been all kinds of stuff gone on and it's just a normal I'm fearful for my job type and I said, you know, what's going on? Am I going to be fired? And [Klasinski's] like no, no you just need to get somebody training. And I said okay. And so that was the end of that . . . ."

From Klasinski's perspective, it was obvious Anderson did not want to train Abbot and very clear Anderson did not like what Klasinski had asked her to do. "She -- she just made it vocally clear. She made it vocally clear in front of other employees. It was upsetting."

Klasinski returned to her office and sent an e-mail to Loughry at 10:07 a.m. that read: "I need to let Jennifer go today so please give me a call when you get a minute."

17

After sending the e-mail, Klasinski met twice with Loughry and told him Anderson had yelled at her in front of other staff members and she considered it disrespectful and insubordinate. Loughry testified:

> She was very upset and that she wanted -- she was contemplating letting Jennifer go. I told her, you know, as an elected official, it's your decision on who you fire, Janet. If that's a decision you're going to make, then that's up to you legally.
>
> ….
>
> She explained to me what had happened, that Jennifer yelled at her in front of other staff members. She considered it to be disrespectful and insubordinate and that she wanted to -- she had originally wanted to let Jennifer go but she wasn't so sure now. She wanted to have time to think about it. And that one of her primary concerns was the ability to run payroll. I told her if -- you can't allow an employee to hold you hostage because of their ability and your fear that you can't get it done. If that's the direction you want to go, that's your call. I will help you any way I can, including coming down and assisting with payroll if need be.

Klasinski was concerned about how payroll for 400 employees would be handled if Anderson was fired, and felt they needed to have a plan in place. Loughry told Klasinski it was her decision, but if she decided to terminate Anderson they would make it work and would contact the County's payroll provider for assistance if need be.

That afternoon, Anderson met with Klasinski and Loughry, and Klasinski told her that what had happened that morning had been very disrespectful and that she was going to have to let her go.

Anderson was terminated on February 13, 2019. Klasinski terminated Anderson for insubordination and raising her voice. Neither her 2017 Charge of Discrimination

nor her concerns about Loughry's request for vacation pay came up at the termination meeting. Anderson and Hughes are the only two employees Klasinski has terminated for cause as County Clerk.

Anderson believes that after she, Hughes, and Copeland filed EEOC charges in 2017, they had had a "target on [their] back[s]." She testified that the termination of the three employees who filed charges "looks a little suspicious," because "[w]e were the three that were fired basically for no reason."

After Anderson's termination, the idea of having Abbot cross-train "fizzled out" according to Gillaspie, who replaced Anderson as payroll manager.

The County propounded an interrogatory on Plaintiff asking her to identify, by name, any employee she claimed received more favorable treatment than her, who did not engage in protected activities by setting forth complaint and/or raising concerns to management and/or filing administrative complaints against the County. Plaintiff's response identifies no specific employee by name.

The County also propounded a request for production of "[a]ny notice of claim or similar document served by you or on your behalf on Defendant that pertains to any claim contained in the Complaint, in an effort to satisfy your obligations under K.S.A. 12-105b." Anderson responded: "No letter referencing 12-105b letter exists. Plaintiff has notified defendant of claims pursuant to administrative filings and options to mediate (see bates label 001 to 004 and 037 to 038)."

After Anderson's termination, Abbott was asked by either Loughry or Klasinski to write a statement of the February 13 incident.  Stacey Klingele and Gillaspie were also asked by either Loughry or Klasinski to provide written statements. Gillaspie has testified that Anderson raised her voice but did not yell during the incident.

Shortly after Anderson's termination, Loughry became aware that Anderson was going to be hired by the sheriff's department. Loughry emailed the sheriff to tell him that his hiring Anderson would probably create come difficulties.

Suggesting that Klasinski deferred to Loughry on employment decisions, plaintiff cites her own testimony that "everything went through Mark Loughry."  But the actual testimony is far more restricted. In the cited testimony, the "everything" only referred to instances in which "a department head would contact her [Klasinski] and have an issue with an employee that they would want to terminate," and that in any event the testimony appears to be entirely conclusory and without personal knowledge.

The evidence is uncontroverted that the only other employee terminated by Klasinski was Hughes, and Klasinski's uncontroverted testimony is that Klasinski did not consult with Loughry, but simply asked him to deliver the news because she was nervous about doing so personally. The plaintiff provides no basis for believing that she personally was aware of Klasinski consulting with Loughry or taking direction from him about terminating Clerk's employees.

Plaintiff also argues that the subsequent decision to eliminate Abbott's position was made jointly by Klasinski and Loughry, even though she was a under the Clerk's

20

office. However, the evidence establishes that Abbott's job duties included work for both the Clerk and the County Administrator.

Plaintiff states that in all the years she worked for the County, she never saw any reports of someone terminated for being disrespectful. Her employment file contains no reprimand on the forms that used by the County. The only time Anderson knew that County policy was not followed and an employee was terminated without utilizing the steps in the policy manual was when older female employees were terminated.

**Conclusions of Law**

The County argues that Anderson has failed to present a prima facie case of retaliation, and that, even if she had, it would be entitled to summary judgment because there was a legitimate, non-pretextual reason for terminating Anderson. Having reviewed the evidence the court concludes that plaintiff has failed to establish a prima facie case of retaliation because she has failed to show that participation in protected activity caused her termination. *See McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006) (discussing elements of claim).

Here, Anderson's EEOC complaint was filed well over a year before her termination in 2019. This is well beyond the time period when temporary proximity alone may supply an inference of retaliation. *See Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) ("a three-month gap between protected activity and an adverse action is

too long to support an inference of causation on its own"), *citing Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

By the time of the termination, the composition of the Board of County Commissioners had changed substantially from 2017, with only one Commissioner remaining from the time of the EEOC charge was filed. Moreover, Klasinski as County Clerk had the power under Kansas law to terminate her employees, independent of the Board. *See Bd. of Cnty. Comm'rs of Lincoln Cnty. v. Nielander*, 275 Kan. 257, 267, 62 P.3d 247 (2003). There is no evidence that Klasinski knew of the contents of the 2017 EEOC charge filed by Anderson, and Klasinski never mentioned the charge to Anderson.

The plaintiff contends an inference of retaliation arises because the three HR employees who presented EEOC complaints in 2017 were all ultimately terminated. But any such inference is reduced to mere speculation when the individual circumstances of each employee are considered. Both Copeland and Hughes were terminated long before Anderson. Copeland was terminated by the Board, at a time with the HR Department was not under the supervision of the County Clerk. Klasinski did terminate Hughes, but it is uncontroverted that Hughes was not performing her job adequately. Anderson *herself* complained to Klasinski that Hughes was struggling to get her work done.

This leaves only the termination of Anderson herself in 2019. Plaintiff suggests that when Klasinski terminated her, she was operating as Loughry's "cat's paw," citing *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (recognizing liability where "a biased subordinate, who lacks decision-making power,

uses the formal decisionmaker as a dupe in a deliberate scheme"). But that doctrine arose in a case in which the decision-maker never met the plaintiff, and acted solely on the basis of false information supplied by another, subordinate employee. A plaintiff invoking the doctrine "must establish more than mere 'influence' or 'input' in the decision-making process," but that "the biased subordinate's discriminatory reports, recommendations, or other actions *caused* the adverse employment action." 450 F.3d at 478 (emphasis added).

The doctrine has no application here. At time of the termination, the ability to terminate HR employees rested solely with the County Clerk, a coequal agent of the county government. *See* Kan. Att'y Gen. Op. No. 2016-16. More importantly, Anderson was insubordinate and raised her voice to Klasinski, not Loughry. Klasinski determined that Anderson's conduct was unacceptable on the basis of her own direct personal knowledge of the incident, not based on hearsay from a subordinate.

Nor is there is no evidence that Loughry somehow otherwise "caused" the termination. Anderson argues that Loughry unfairly inserted himself into the HR Department when he verbally counseled her in 2017, when he made the decision to fire Hughes, and when Abbott's position was later eliminated. The first claim rests on a mistake of fact. As noted earlier, the *stipulated* facts establish that, at the relevant time in October and November of 2017, the HR Department was under Loughry's supervision.

The evidence establishes that Klasinki decided to terminate Hughes in 2017. There is no evidence that Loughry had any role in the matter, other than to deliver news

of Klasinski's decision, and that the County Clerk asked Loughry to do so solely because she was nervous and had never fired anyone before.

Abbott's position is not comparable. Unlike Anderson, who was solely an employee of the HR Department, Abbott performed duties for the County Administrator as well as the County Clerk. It is hardly surprising that Loughry would have input into the decision to maintain Abbott's position.

In short, there is no evidence to support the claim that the decision to terminate plaintiff was anything other than that of the elected County Clerk, Klasinski. Klasinski believed Anderson should be terminated — she emailed Loughry after the verbal confrontation with the plaintiff, "*I need to let Jennifer go today* so please give me a call when you get a minute." (Emphasis added.) Klasinki only consulted Loughry over the ability to continue processing payroll after the termination, not about whether the plaintiff should be fired. It is uncontroverted that Loughry told Klasinki that the decision was hers.

The claim of retaliation ultimately rests on sheer speculation. The County also presents strong arguments that, even assuming a prima facie case existed, it still had a legitimate non-pretextual reason for terminating the plaintiff. However, because the plaintiff has failed to present a prima facie case of discrimination, the court need not address the County's additional arguments. Further, because the parties agree that the same operative facts control plaintiff's ADEA and KAAD claims, the court also

concludes that plaintiff has failed to present valid prima facie claims under those statutes.

IT IS ACCORDINGLY ORDERED this day of April, 2021, that the defendant's Motion for Summary Judgment (Dkt. 26) is hereby granted.

_J. Thomas Marten_
J. Thomas Marten, Judge